IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

DAVE AND BARB SULLIVAN TRUST,    )
                                          )
          Plaintiff,                 )   TC-MD 130052N
                                            )
      v.                         )
                                          )
LINN COUNTY ASSESSOR,         )
                                          )
          Defendant.          )  **DECISION**

      Plaintiff appeals the real market value of property identified as Account 90502 (subject property) for the 2012-13 tax year. A trial was held in the Oregon Tax Courtroom on June 5, 2013. David R. Sullivan (Sullivan) appeared and testified on behalf of Plaintiff. Jordan Marx (Marx), Registered Appraiser, appeared and testified on behalf of Defendant. Plaintiff's exhibits labeled A through W, submitted with its Response to Defendant's Answer (Response), were received without objection. Plaintiff also offered a letter from Susan Haylock, Special Assessment Program Coordinator, dated April 25, 2013, which was received without objection. Defendant's Exhibits A through M were received without objection. Sullivan verbally requested an award of the $240 filing fee at close of trial.

## I. STATEMENT OF FACTS

      The subject property is located at 338 Sixth Avenue Southeast in Albany, Oregon. (Ptf's Ex A at 1, 3.) It is a 2,444 square foot "wood frame construction" dwelling built in 1900. (*Id.* at 1.) Sullivan testified that a very similar property was located at 337 Sixth Avenue until it was "torn down in August 2011[.]" (*Id.*) Sullivan testified that both the subject property and the property previously located at 337 Sixth Avenue were the subject of a "drug raid" in June 2008. (Ptf's Resp at 5; Ptf's Ex M at 2.) Both properties were searched pursuant to an administrative

search warrant and "declared dangerous" by the City of Albany (City) in April 2009. (*Id.*) The City issued "extensive notice-and-orders for repairs" on April 24, 2009. (Ptf's Ex M at 2.) The property owners of 337 Sixth Avenue and the subject property failed to comply and on August 9, 2010, the Linn County Circuit Court issued a General Judgment for Permanent Injunction finding that each property "was and continues to be in violation of the Albany Municipal Code and creates a present risk to the health, safety, welfare, comfort and security of Albany's residents." (Ptf's Ex K at 36.) The Linn County Circuit Court required the property owners to comply with the City's Notices and Orders issued April 24, 2009, and authorized the City "to repair, rehabilitate, demolish and remove any and all conditions in violation of the Notices" if the property owners failed to comply. (*Id.* at 37.)

In July 2011, the property located at 337 Sixth Avenue was listed for sale for $89,000. (Ptf's Resp at 5; Ptf's Ex A at 5.) On July 27, 2011, the City Council held a public meeting on the "[d]emolition of 337 Sixth Avenue SE." (Ptf's Ex L at 1; Ptf's Resp at 5-6.) Minutes from that meeting report public comments by Mary Hartley (Hartley), a licensed real estate agent who had viewed the property at 337 Sixth Avenue, as follows: "The house is in the Hackleman Historic District * * * [It] has been listed for the amount of the liens against it ($89,000), and the listing specifies that the buyer would have to bring the house up to City Code as a single-family residence." (Ptf's Ex L at 3; Ptf's Resp at 5-6.) Hartley estimated that "it would take about $150,000 to $175,000 to bring the house back to single-family condition under City Code." (*Id.*) In an article dated August 5, 2011, the Albany Democrat-Herald reported that "a developer and owner of rental units" had made an offer on 337 Sixth Avenue of "less than the roughly 80,000 owed on it," but that offer was rejected by the City. (Ptf's Ex Q at 1). The City Council

/ / /

approved demolition of the property located at 337 Sixth Avenue and that property was demolished in August 2011. (Ptf's Resp at 6; Ptf's Ex Q.)

The City issued an Order to Vacate the subject property on November 30, 2011, based on the property owner's continued failure to comply with the Notice and Order issued April 24, 2009. (Ptf's Ex K at 63; Ptf's Resp at 6.) In December 2011, the subject property was foreclosed upon and the tenants and property owners were evicted from the subject property. (Ptf's Resp at 6; Ptf's Ex C.) Sullivan provided a letter signed by former tenants of the subject property describing the extremely poor condition of the subject property as of December 2011. (Ptf's Ex C.) Sullivan reported that Fannie Mae spent $8,000 in "late January 2012 to prepare the [subject] property for sale." (Ptf's Resp at 7.) He testified that that cost was incurred to remove drug paraphernalia and trash from the subject property.

The subject property was listed for sale in late February 2012 for $112,900. (Ptf's Resp at 7; Ptf's Ex A at 9.) The listing price was reduced in April, May, and June 2012; the list price as of June 2012 was $79,900. (*Id.*) Plaintiff purchased the subject property for $41,500 through a public auction in July 2012. (*Id.*)

Sullivan testified that, although the subject property was leased to tenants by the prior owner, the only legally permissible use of the subject property as of January 1, 2012, was as a single-family dwelling. He testified that, as of January 1, 2012, the subject property could not have been used as a triplex. Sullivan provided a copy of the applicable zoning code as of November 2012 for the Hackleman-Monteith District where the subject property is located. (Ptf's Ex I.) The zoning code states, in part, that "[c]onversion of single-family residential structures to other uses, including multi-family residential, is not allowed." (*Id* at 1.) Sullivan testified that, as of January 1, 2012, a single-family residential structure in the Hackleman-

Monteith District had to be approved for the "special status list" in order to be converted to multi-family use. (*Cf. id.* at 9-10.) The zoning code states in pertinent part:

> "The property will be added to the list administratively if the owner or the City provide documents that clearly and objectively establish that the use ['duplex and multi-family development'] existed prior to adoption of City zoning in 1946; or if the City can clearly and objectively verify the use was allowed in the zoning district at the time it was established and met the minimum lot size, maximum lot coverage and parking standards, as applicable. All other requests will be reviewed through the Type I-L land use process and notice will be given to property owners within 100 feet. In order to approve the request, the applicant must document when the use was established and whether the use received the relevant approvals at that time. Satisfactory evidence must be provided by the property owner or applicant to document that the use was legally established. * * *."

(*Id.* at 10.) Sullivan testified that the subject property was not on the "special status list" as of January 1, 2012, so it could not legally have been used as a triplex. (*See* Ptf's Ex J (Albany Special Status List, last updated "10/10/12").) He testified that to comply with the Notice and Order and Injunction the subject property had to be converted back to a single-family dwelling.

> Sullivan provided a May 2012 email from Anne Catlin, Albany City Planner, stating:

> "the City has no interest in removing the house. There has been some interest in the house since it is for sale, primarily to keep it as apartments, which would not be permitted since the current units were not legally created. So the house would need to be returned to single-family."

(Ptf's Ex B at 2.) Sullivan also provided a May 2012 email from Mary Gaeta, Senior Code Compliance Inspector for the City, stating:

> "The City's notice and list of needed repairs were issued in 2009 and work has been done since then, so it is not an accurate picture of the property's current needs. It was also written for the previous owner who was given the opportunity to keep the house as a multi-family dwelling if he complied with our requests to bring it to a safe and habitable state. It might be easiest to have a meeting * * * to

/ / /

/ / /

DECISION TC-MD 130052N                                                                          4

go over what would be required for someone to bring the house back to single-family status and restore it."

(*Id.* at 1.) Sullivan testified that the subject property was added to the special status list on or around March 19, 2013, and could be used for multi-family after that time. (*Cf.* Def's Ex L (emails between Sullivan and Heather A. Hansen, Community Development Director for the City, discussing the requirements to add the subject property to the "special status list").)

Sullivan testified that as of the date of trial he was working to convert the subject property to a triplex. He testified that all of the work he completed on the subject property in 2012 was with the understanding that the subject property could be used only as a single-family dwelling. Sullivan provided photographs of the subject property that he took in July 2012 after his purchase. (Ptf's Ex O.) He testified that the subject property had four electrical meters in July 2012. (*Id.* at 16.) Sullivan testified that, as of March 2013, the subject property had a single electrical meter that he placed as part of his conversion of the subject property to a single-family dwelling. (*Id.* at 16-17.) Sullivan testified that, in additional to switching the electrical meter, he removed a considerable amount of sheet rock to increase the ceiling height and replaced wiring and plumbing.

Plaintiff requests a real market value of $32,017, based on its purchase price of $41,500, less $8,000 spent by Fannie Mae to remove debris from the subject property in January 2012 and adjusted for the change in market conditions between January and July 2012. (Ptf's Am Compl at 6.) Sullivan testified that the effort to sell the now-demolished property located at 337 Sixth Avenue provides additional support for Plaintiff's requested value. He noted that that property was listed for sale, did not sell, and was ultimately demolished at a cost of $25,000.

Marx presented a report in which he described the subject property as of January 1, 2012, as "a multi family historic property with high deferred maintenance." (Def's Ex A at 2.) He

"agreed that the property was not in livable status as of the appraisal date and was vacant." (*Id.*)

Marx reported that Defendant "was not allowed on site [at the subject property] until early 2013. As of that inspection, the property was assumed to be approximately 40% complete." (Def's Ex A at 2.) He testified that he treated the subject property improvement as "40 percent complete" as of January 1, 2012, and used that percentage complete to adjust his value conclusions under each of the approaches of value. (*See id.* at 2-6.)

Marx "placed little weight in terms of valuation evidence, on the sale of the subject" property because it was an "auction sale" and, therefore, a "non arms-length transaction." (Def's Ex A at 2 (internal quotation marks omitted).) He provided an August 3, 2012, newspaper article discussing Plaintiff's purchase of the subject property at auction. (Def's Ex M at 1.) Marx highlighted a statement in the article that Plaintiff "got the house after offering what they considered a low bid to Auction.com. 'Somewhat unexpectedly, the bid was the highest one submitted and it was accepted by Fannie Mae,' Sullivan said." (*Id.*)

Marx utilized all three approaches of value. (Def's Ex A at 2.) He testified that there were few sales in Albany close to January 1, 2012, so he considered sales of both single-family and multi-family properties. (*Id.* at 3.) Marx did not make adjustments to his sales, which sold between June 2011 and April 2012. (*See id.*) Based on those sales and his conclusion that the subject property improvement was 40 percent complete, Marx determined a real market value of $101,802 under the sales comparison approach. (*Id.*) Under the cost approach, Marx concluded a real market value of $117,544.55 for the subject property at 40 percent complete. (*Id.* at 4.) In his gross rent multiplier approach, Marx used rents for triplexes and fourplexes. (*See id.* at 5.) Under the gross rent multiplier approach, he concluded a real market value of $120,330 for the subject property at 40 percent complete. (*Id.*) Marx placed little weight on the sales comparison

approach due to "the uniqueness of the property," and more weight on the gross rent multiplier and cost approaches. (*Id.* at 2.) He concluded a real market value of $120,000. (*Id*. at 6.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[1]

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. OAR 150-308.205-(A)(2)(a); *see, e.g., Allen v. Dept of Rev*., 17 OTR 248, 252 (2003). The real market value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. *See* ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). If the evidence is inconclusive or unpersuasive, Plaintiff will have failed to meet its burden of

___
[1] All references to the Oregon Revised Statutes (ORS) are to 2011.

proof. *See Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Plaintiff's purchase of the subject property*

Plaintiff requests that the 2012-13 real market value of the subject property be reduced to $32,017, based on its July 2012 purchase price of $41,500, less $8,000 spent by Fannie Mae to remove debris from the subject property in January 2012 and adjusted for the change in market conditions between January and July 2012. "A recent sale of the property in question is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.* (*Kem*)*,* 267 Or 111, 114, 514 P2d 1335 (1973). "In the absence of data indicating that the price paid was out of line with other market data material, we believe a recent sale to be one of the best and most satisfactory standards for the estimation of actual value although, admittedly, it is not conclusive." *Ernst Bros. Corp. v. Dept. of Rev.* (*Ernst*), 320 Or 294, 300, 882 P2d 591 (1994) (internal quotation marks omitted).

Under *Kem*, a sale of the subject property must be "recent." 267 Or at 114. "Whether a transaction is so recent as to be persuasive of present value will depend upon the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974). Sullivan asserted that "home values in Albany" were "[r]ising" from January through July 2012. (Ptf's Am Compl at 6.) Sullivan based his determination on a review of "the average home's real market value" on "Zillow.com." (*Id.*) Marx testified that there were few sales in Albany close to

the January 1, 2012, assessment date. He considered sales ranging from June 2011 to April 2012, yet made no time adjustments to his sales. The evidence presented is inconclusive with respect to the change, if any, in market conditions from January to July 2012. Given the condition of the subject property and the circumstances leading up to its sale, the court is not persuaded that the market for the subject property was the same as the market for average homes in the area.

Under *Kem*, the sale must also be an "arm's length transaction." 267 Or at 114. Marx did not rely on the sale of the subject property based on his determination that it was not an "arm's length transaction." (Def's Ex A at 2.) This court does not typically consider an auction sale to be an arm's length transaction because there is no negotiation between the buyer and seller. *See, e.g., Metzger v. Clatsop County Assessor*, TC-MD No 120534D at 7 (Oct 30, 2012). However, this court has found the price paid at auction to be the real market value of a property under certain circumstances. In *Krummenacker v. Department of Revenue* (*Krummenacker/Zimmerling*), 17 OTR 164, 168 (2003), this court accepted as the real market value the auction price of a property sold at a "well-advertised, oral, public auction" of which "other property owners with property abutting the parcel were notified * * * but failed to place a bid." The court noted that "[p]roperty with a limited market, such as the [property at issue] in this case, may present difficulties in determining an opinion of market value. Such limited market properties have relatively few potential buyers." *Krummenacker/Zimmerling* at 168 n 6; *see also Ernst*, 320 Or at 304 ("[t]he fact that the market for a property is small and that few potential buyers were interested in the property does not necessarily diminish the role that a sale of that property may play in determining the property's value for assessment purposes").

/ / /

Here, the court finds that the subject property's auction price of $41,500 is persuasive evidence of its real market value as of January 1, 2012. As noted above, the court finds that the market for the subject property was limited as of January 1, 2012. The subject property and the neighboring property located at 337 Sixth Avenue were subject to a "drug raid" in 2008. Both properties were found by the City to be "dangerous" and the occupants were ultimately evicted. The City demolished the property at 337 Sixth Avenue in 2011 following an attempt to sell it. The parties agree that the subject property was not habitable as of January 1, 2012. The subject property was listed in February 2012 but did not sell despite price reductions. The sale of the subject property was well advertised, as evidenced by several newspaper articles describing the history of the subject property and the property at 337 Sixth Avenue, as well as efforts to sell the properties.

Plaintiff asserts that the subject property sale price should be adjusted for the $8,000 cost incurred by Fannie Mae to remove trash and drug paraphernalia, and for the rise in market conditions from January to July 2012. The court finds both adjustments to be speculative and unsupported. The cost to remove trash and drug paraphernalia was borne by Fannie Mae, not Plaintiff. There is no evidence that a potential buyer as of January 1, 2012, would have incurred that cost rather than Fannie Mae. Plaintiff's evidence of the rise in market conditions between January and July 2012 is unpersuasive. As discussed above, the court is not persuaded that market for the subject property was the same as that for average homes in the area.

B.    *Defendant's real market value evidence*

Marx presented an appraisal report utilizing the three approaches of value, based on which he determined that the real market value of the subject property as of January 1, 2012, was $120,000. The court finds his appraisal report unpersuasive because it relies on unsupported

assumptions. First, Marx's conclusion that the subject property was 40 percent complete as of January 1, 2012, is unsupported. He provided no explanation of or support for his conclusion that the subject property was 40 percent complete as of January 1, 2012. Marx testified that he based that conclusion on an inspection of the subject property in early 2013, over one year after the assessment date. Sullivan testified persuasively that he worked on the subject property after the July 2012 purchase and he provided extensive photographs of the subject property in July 2012 and in March 2013. (Ptf's Ex O.) The evidence does not support the conclusion that the subject property's condition as of early 2013 was the same as its condition as of January 1, 2012.

Second, Marx failed to complete a highest and best use analysis for the subject property as of January 1, 2012. As a result, he selected sales of properties that were not comparable to the subject property and erroneously utilized the gross rent multiplier approach. " 'Highest and best use' means the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e). Highest and best use is "[t]he first question that must be addressed in a credible appraisal." *Hewlett-Packard Company v. Department of Revenue*, TC No 4979, WL 1987281 at *2 (May 15, 2013) (citing *Freedom Fed. Savings and Loan v. Dept. of Rev.,* 310 Or 723, 801 P2d 809 (1990)). Highest and best use "affects what other properties may be considered comparable, a fundamentally important question when selecting so called 'comparable' sales and determining, where appropriate, which properties are selected for use in determination of elements of the income indicator analysis." *Id.*

Marx did not include a highest and best use analysis in his appraisal report. He testified that his highest and best use analysis was "qualitative." In his sales comparison and gross rent multiplier approaches, Marx considered triplex and fourplex properties. The court inquired at

trial whether Marx agreed with Sullivan that the subject property could not legally be used as a multi-family dwelling as of January 1, 2012. Marx testified in response that the subject property had no legally permissible uses as of January 1, 2012.[2] He presented no evidence in support of his statement that the subject property had no legally permissible uses as of January 1, 2012, and it is unclear how he made that determination. The evidence presented by Sullivan established that, upon compliance with the list of repairs described in the Notice and Order issued by the City on April 24, 2009, and ordered by the Linn County Circuit Court in the General Judgment for Permanent Injunction issued August 9, 2010, the use of the subject property as a single family dwelling was legally permissible as of January 1, 2012.

The highest and best use of a property must be a "legal use." OAR 150-308.205-(A)(1)(e). Sullivan presented persuasive evidence, including the applicable zoning code and written correspondence from a city planner and a code compliance inspector, establishing that multi-family uses of the subject property were not permissible as of January 1, 2012. The subject property was not approved for conversion to a triplex until 2013. As discussed above, the court is persuaded that, upon completion of the required repairs, use of the subject property as a single family dwelling was legally permissible as of January 1, 2012.

C.      *Plaintiff's request for the filing fee*

Sullivan verbally requested at trial that the court award Plaintiff the $240 filing fee. He did not cite any authority in support of his request. ORS 305.490(1) states that "[p]laintiffs or petitioners filing a complaint or petition in the tax court shall pay the filing fee established under ORS 21.135 at the time of filing for each complaint or petition." Taxpayers may file a

---

[2] If Marx's statement that the subject property had no legally permissible uses as of January 1, 2012, is correct, then the subject property should have been valued as vacant land. The court received no evidence of the real market value of the subject property land as vacant.

Declaration and Application for Waiver of Fee at the time of filing a complaint. There is no provision in the statutes or court rules for a refund of that fee. This court has previously determined that there is no statutory authority for an award of costs and disbursements in the Magistrate Division of the Oregon Tax Court. *See Wihtol v. Multnomah County Assessor*, TC-MD No 120762N (Jan 30, 2013.) Plaintiff's request for the $240 filing fee is denied.

III.  CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the real market value of the subject property as of January 1, 2012, was $41,500, based on Plaintiff's July 2012 purchase price. No adjustments to that price are supported. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 90502 was $41,500 for the 2012-13 tax year.

IT IS FURTHER DECIDED that Plaintiff's request for the $240 filing fee is denied.

Dated this ____ day of July 2013.

ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.***

***This Decision was signed by Magistrate Allison R. Boomer on July 18, 2013. The court filed and entered this Decision on July 18, 2013.***